BETTYE HAIRSTON, ADMINISTRATRIX OF THE ESTATE OF JOHN O. HAIRSTON, PLAINTIFF v. ALEXANDER TANK AND EQUIPMENT CO. AND HAYGOOD LINCOLN MERCURY, INC., ORIGINAL DEFENDANTS, AND ALEXANDER TANK AND EQUIPMENT CO., THIRD PARTY PLAINTIFF v. JAMES FULTON WHITBY AND TWO-WAY RADIO OF CHARLOTTE, INC., THIRD PARTY DEFENDANTS

No. 80PA83

(Filed 2 February 1984)

1. Negligence § 9— negligence of defendant car company a proximate cause of death—element of foreseeability

A jury could find that a reasonably prudent person should have foreseen that a car company's negligence in failing to tighten the lug on the wheel of a new automobile could cause the car to be disabled on the highway and struck by another vehicle, causing harm to the driver.

2. **Automobiles and Other Vehicles § 87.4; Negligence § 10— error to find negligence of truck driver completely insulated negligence of car company in failing to tighten wheel lugs**

   In an action to recover for the wrongful death of plaintiff's intestate who was killed while standing behind his new car after the left rear wheel came off, the negligence of defendant car dealer in failing to tighten the lug bolts on the left rear wheel and in failing to check the car before delivery to the intestate was not completely insulated by the negligence of defendant truck driver in failing to keep a proper lookout and in failing to keep his vehicle under proper control. "In order for the conduct of the intervening agent to break the sequence of events and stay the operative force of the negligence of the original wrongdoer, the intervening conduct must be of such nature and kind that the original wrongdoer had no reasonable ground to anticipate it," and on the facts of this case, a jury might readily find that defendant car dealership could have reasonably foreseen the subsequent acts of defendant truck driver and the resultant harm to decedent that occurred barely six minutes and 3.5 miles away from the dealership. The truck driver's negligence was not so highly an improbable or extraordinary occurrence as to bear no reasonable connection to the harm threatened by the car dealership's original negligence.

3. **Automobiles and Other Vehicles § 21.1— failure to instruct on doctrine of sudden emergency—proper**

   Defendant was not entitled to invoke the doctrine of sudden emergency, and therefore the trial court did not err in failing to so instruct, where the evidence showed that defendant's negligence created the emergency he contended confronted him.

4. **Evidence § 49.1— hypothetical question—present monetary value of decedent—opinion properly allowed**

   A hypothetical question put to an economics expert concerning the present monetary value of decedent to his wife and his daughter for the loss of the reasonably expected net income and services of decedent was entirely proper where the question included only those facts in evidence or logically inferred from the evidence and were sufficient to enable the witness to form a satisfactory opinion. Further, the expert's opinion was based on a proper foundation.

ON certiorari to review the decision of the Court of Appeals, 60 N.C. App. 320, 299 S.E. 2d 790 (1983), finding no error in the judgment entered by *Lewis, J.,* at the 1 June 1981 Mixed Session of Superior Court, MECKLENBURG County. Heard in the Supreme Court 5 October 1983.

This is an action for the wrongful death of plaintiff's decedent instituted on 10 September 1979. At the conclusion of the trial on 9 June 1981, the jury answered all issues in favor of the plaintiff and against both corporate defendants, awarding damages in the amount of $200,000. On 10 June 1981, both defendants

filed motions under Rule 50 of the North Carolina Rules of Civil Procedure for judgment notwithstanding the verdict and under Rule 59 for a new trial. All motions of defendant Alexander Tank and Equipment Company (Alexander Tank) were denied. The motion of defendant Haygood Lincoln Mercury, Inc. (Haygood) for judgment notwithstanding the verdict was allowed. Haygood's motion in the alternative for a new trial was denied. On 11 June 1981, judgment was entered against the defendant Alexander Tank in the principal sum of $209,709.29 in accordance with stipulated additional damages for medical and hospital expenses, funeral expenses, and property damage.

Plaintiff and defendant Alexander Tank appealed from the granting of the motion of defendant Haygood for judgment notwithstanding the verdict. Defendant Alexander Tank also appealed from the court's denial of other post-trial motions of Alexander Tank. All matters having to do with third-party claims by Alexander Tank against James Fulton Whitby and Two-Way Radio of Charlotte, Inc. have been disposed of and are not a part of this appeal.

*Tucker, Hicks, Sentelle, Moon and Hodge, P.A., by John E. Hodge, Jr., Fred A. Hicks and David B. Sentelle, for plaintiff.*

*Hasty, Waggoner, Hasty, Kratt & McDonnell, by Robert D. McDonnell and William J. Waggoner, and Golding, Crews, Meekins, Gordon & Gray, by Fred C. Meekins and Henry C. Byrum, Jr., for defendant Alexander Tank and Equipment Company.*

*Hedrick, Feerick, Eatman, Gardner & Kincheloe, by J. A. Gardner III and Scott M. Stevenson, for defendant Haygood Lincoln Mercury, Inc.*

MARTIN, Justice.

John O. Hairston's death was caused by a collision on the South Fork River Bridge on Interstate 85 in Gaston County on 17 April 1978. Taken in the light most favorable to plaintiff, her evidence tends to establish the following facts: On Friday, 14 April 1978, Hairston negotiated the purchase of a 1978 Lincoln Continental automobile at Haygood Lincoln Mercury, Inc. in Lowell, North Carolina. The automobile as originally received by Haygood from the Ford Motor Company had been equipped with

optional turbine spoke wheels. These wheels were included on the original invoice. When Hairston returned to Haygood to complete the transaction and pick up the car the following Monday, 17 April 1978, he found the Lincoln equipped with standard steel wheels. At his request and while he waited, Haygood's service department employees replaced the standard wheels with turbine wheels from another automobile, installed a CB radio, and undercoated the car. Although Haygood's normal procedure was to test drive a new car before delivery to a customer, no one road tested the Lincoln prior to turning it over to Hairston. The service manager did not make any inspection of the car after the wheels were changed.

A few minutes past five o'clock that afternoon, Hairston was driving his new automobile north on Interstate 85 toward Charlotte. He had entered I-85 from North Carolina Highway 7, the Lowell-McAdenville Road, which crosses over the interstate approximately six-tenths of a mile south of the South Fork River Bridge.

Traffic was moderate. It was daylight and the light was good. The road was dry. Proceeding north from N.C. 7 to the South Fork River Bridge, I-85 curves slightly to the right, then is straight for at least a quarter of a mile to the bridge. The interstate is downgrade from N.C. 7 to the South Fork River Bridge, and visibility is unobstructed from the end of the entrance ramp at N.C. 7 to the bridge. There are two northbound lanes of I-85 over the South Fork River. The downgrade continues on the bridge, levelling out before the bridge is crossed.

When Hairston had traveled approximately 3.5 miles from the Haygood dealership and was approaching the South Fork River Bridge on I-85, the left rear wheel of the new Lincoln car came off and went down an embankment on the right side of the interstate. Gouge marks in the roadway made by the left rear hub on the Hairston car extended for a total of 208 feet from a point thirty-eight feet before the beginning of the bridge to where Mr. Hairston brought the automobile to a stop, 170 feet onto the bridge, in the far right lane of travel. There were concrete bridge abutments on the left and right sides of the bridge. There were no shoulders on the road where it crossed the bridge.

James Fulton Whitby, driving a 1970 Ford Econoline van owned by Two-Way Radio of Charlotte, Inc. had seen the Hairston vehicle as it entered I-85 from the Lowell exit ramp and had been

traveling several car lengths behind Hairston, there being one passenger car between his van and Hairston's car. After the wheel came off the Lincoln, the passenger car between Whitby and Hairston changed into the left-hand lane of travel and proceeded north, going around the Hairston car where it had come to a stop on the bridge. Whitby stopped his van approximately twenty feet behind the disabled Lincoln, set his hand brakes, activated his two-way emergency flashers, and got on his mobile telephone to call for help.

Mr. Hairston, having turned on the Lincoln's flashers, got out of his car. He looked at the left rear hub where his wheel had been, went to the other side of the car and looked, then went to the middle of the rear of his car where he was attempting to open his truck. Mr. Whitby, meanwhile, was calling for help, and as he observed in his outside left rearview mirror, traffic in the right lane was moving with no difficulty over into the left lane to bypass the stopped vehicles.

Among the approaching vehicles Whitby saw in his rearview mirror after he stopped behind Hairston was the G.M.C. flatbed truck operated by Robert F. Alexander, still about a quarter of a mile away. Within seconds the right front end of Alexander's truck struck the left rear of the Two-Way Radio van, knocking it into the rear of the Hairston automobile. Mr. Hairston, who was between the van and his car at the time of the collision, was killed. Approximately ninety seconds had elapsed from the time Whitby had first stopped his van behind the decedent until he was struck by Alexander.

Examination of the left rear wheel assembly of the Lincoln following the accident revealed that none of the lug bolts had been stripped or otherwise damaged. The brake drum showed signs that it had come loose and fallen down onto the lug bolt threads. The outside of the aluminum wheel was marked by "chewed up" aluminum indicating where the lug bolts had spun off. An expert witness called by plaintiff testified that the lug nuts used on the left rear wheel of the Lincoln had a right-hand thread which if left loose would unscrew when the wheel rolled forward. In his opinion, the wheel on the Lincoln had come off, therefore, because the lug nuts had not been tightened on the wheel studs.

The jury found both defendants negligent, whereupon defendant Haygood argued the following to the court in support of its motion for judgment notwithstanding the verdict:

2. That the evidence unequivocally reflects that the negligence, if any, of Haygood Lincoln Mercury, was not a proximate cause of the death of the decedent, John O. Hairston;

3. That the evidence has failed to show active negligence on the part of the defendant Haygood Lincoln Mercury, Inc.;

4. That the negligence, if any, of Haygood Lincoln Mercury, was insulated as a matter of law by the negligence and actions of the defendant Alexander Tank and Equipment Company, Inc.

In its unanimous opinion, the Court of Appeals upheld Judge Lewis's decision to allow the Haygood motion, finding:

The record clearly shows sufficient evidence from which the jury could find Haygood was negligent in failing to tighten the lug bolts on the left rear wheel and in failing to check the new car before delivery. These acts of negligence, however, are not the proximate cause of the death of plaintiff's intestate, and such negligent acts of Haygood are insulated by the subsequent negligent acts of Alexander.

60 N.C. App. at 327, 299 S.E. 2d at 794.

We do not so interpret the law. On the facts of this case, defendant Haygood's negligence was one of the proximate causes of Hairston's death. At no time was this liability superseded or excused by the subsequent negligence of Alexander Tank and Equipment Company, Inc. which occurred all too foreseeably on I-85 within one and one-half minutes of decedent's automobile becoming disabled on the interstate.

In order to establish actionable negligence, plaintiff must show (1) that there has been a failure to exercise proper care in the performance of some legal duty which defendant owed to plaintiff under the circumstances in which they were placed; and (2) that such negligent breach of duty was a proximate cause of the injury. *Murray v. R.R.*, 218 N.C. 392, 11 S.E. 2d 326 (1940); *Whitt v. Rand*, 187 N.C. 805, 123 S.E. 84 (1924). In determining whether the Court of Appeals properly affirmed the trial court's entry of judgment notwithstanding the verdict in favor of defendant Haygood, we must ask, as we would in the case of a directed

verdict, *Summey v. Cauthen,* 283 N.C. 640, 197 S.E. 2d 549 (1973): Did the evidence at trial, when taken in the light most favorable to the plaintiff and with the benefit of all favorable inferences, either (1) fail to establish a prima facie case of negligence on the part of Haygood, or (2) establish beyond question that the negligence of Haygood was insulated as a matter of law by the intervening negligence of defendant Alexander Tank? *Norwood v. Sherwin Williams Co.,* 303 N.C. 462, 279 S.E. 2d 559 (1981); *Summey v. Cauthen, supra.*

We agree with the Court of Appeals that the record clearly reveals sufficient evidence from which a jury could find the first requisite of liability, negligence. That Haygood violated a legal duty to this plaintiff in failing to tighten the lug bolts on the left rear wheel and in failing to check the new car before delivery is self-evident.

For reasons which follow, however, it is also our opinion that from the evidence presented at trial the jury could reasonably infer that defendant's negligence was a proximate cause of Hairston's death. The jury could further infer from the facts in this case that while the subsequent negligence of defendant Alexander Tank joined with Haygood's original negligence in proximately causing the death of Hairston, it did not supersede the negligent acts of Haygood and thereby relieve Haygood of liability.

[1] Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed. *Kanoy v. Hinshaw,* 273 N.C. 418, 160 S.E. 2d 296 (1968); *Green v. Tile Co.,* 263 N.C. 503, 139 S.E. 2d 538 (1965). *See generally* Byrd, *Proximate Cause in North Carolina Tort Law,* 51 N.C. L. Rev. 951 (1973). Foreseeability is thus a requisite of proximate cause, which is, in turn, a requisite for actionable negligence. *Nance v. Parks,* 266 N.C. 206, 146 S.E. 2d 24 (1966); *Osborne v. Coal Co.,* 207 N.C. 545, 177 S.E. 796 (1935).

It is well settled that the test of foreseeability as an element of proximate cause does not require that defendant should have

been able to foresee the injury in the precise form in which it actually occurred.

All that the plaintiff is required to prove on the question of foreseeability, in determining proximate cause, is that in "the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected."

*Hart v. Curry,* 238 N.C. 448, 449, 78 S.E. 2d 170, 170 (1953) (citation omitted). *See also Drum v. Miller,* 135 N.C. 204, 47 S.E. 421 (1904) (and citations therein).

The law requires only reasonable prevision. A defendant is not required to foresee events which are merely possible but only those which are reasonably foreseeable. *Bennett v. R.R.,* 245 N.C. 261, 96 S.E. 2d 31 (1957). *See also* 9 Strong's N.C. Index 3d *Negligence* § 9 (1977).

We note, however, that the law of proximate cause does not always support the generalization that the misconduct of others is unforeseeable. The intervention of wrongful conduct of others may be the very risk that defendant's conduct creates. In the absence of anything which should alert him to the danger, the law does not require a defendant to anticipate specific acts of negligence of another. It does, however, fix him with notice of the exigencies of traffic, and he must take into account the prevalence of that "occasional negligence which is one of the incidents of human life." *Beanblossom v. Thomas,* 266 N.C. 181, 146 S.E. 2d 36 (1966); Restatement (Second) of Torts § 447, comment c (1965). *See also* Byrd, *Proximate Cause in North Carolina Tort Law,* 51 N.C. L. Rev. 951 (1973).

There may be more than one proximate cause of an injury. When two or more proximate causes join and concur in producing the result complained of, the author of each cause may be held for the injuries inflicted. The defendants are jointly and severally liable. *Hall v. Carroll and Moore v. Carroll,* 255 N.C. 326, 121 S.E. 2d 547 (1961); *Riddle v. Artis,* 243 N.C. 668, 91 S.E. 2d 894 (1956).

Proximate cause is an inference of fact to be drawn from other facts and circumstances.

It is only when the facts are all admitted and only one inference may be drawn from them that the court will declare whether an act was the proximate cause of an injury or not. But that is rarely the case. . . . Hence, "what is the proximate cause of an injury is ordinarily a question for the jury."

*Conley v. Pearce-Young-Angel Co.; Rutherford v. Pearce-Young-Angel Co.*, 224 N.C. 211, 214, 29 S.E. 2d 740, 742 (1944) (citations omitted.) *See Oxendine v. Lowry*, 260 N.C. 709, 133 S.E. 2d 687 (1963); *Rouse v. Jones*, 254 N.C. 575, 119 S.E. 2d 628 (1961).

Applying the foregoing to the facts of this case to determine whether the negligence of defendant Haygood was a proximate cause of decedent's death, the decisive question is one of foreseeability. Under the circumstances here disclosed, we believe a jury could find that a reasonably prudent person should have foreseen that Haygood's negligence in failing to tighten the lugs on the wheel of the new automobile could cause the car to be disabled on the highway and struck by another vehicle, causing harm to the driver. Absent Haygood's original negligence, the tragic series of events on I-85 would not have occurred; the danger was foreseeable. Proximate causation is thus established and, with it, defendant's liability.

[2] We turn now to the question whether the evidence in this case is susceptible of the single inference by the jury that Haygood's negligence ceased to be the proximate cause of decedent's death and that it was superseded and insulated by the subsequent negligence of defendant Alexander Tank.

The Court of Appeals found that Alexander was negligent in failing to keep a proper lookout for vehicles stopped on the highway and in failing to keep his vehicle under proper control. "These negligent acts of Alexander — new and independent of any negligent acts of Haygood — constitute the proximate cause of injury and the death of plaintiff's intestate, and the negligence of Haygood was shielded by the subsequent acts of negligence by Alexander." 60 N.C. App. at 328, 299 S.E. 2d at 795.

We do not agree with the conclusion of the Court of Appeals. Under the applicable law summarized above, the negligent acts of Alexander quite properly may be found to be a proximate cause

of the injury and death in this case: Without Alexander's negligence, the collision would not have occurred; the injury was clearly foreseeable, given the failure to keep a proper lookout. It is also true, of course, that Alexander's unfortunate lack of attention to the road acted independently of Haygood's earlier carelessness. These facts, however, do not of themselves absolve defendant Haygood from his liability.

Insulating negligence means something more than a concurrent and contributing cause. It is not to be invoked as determinative merely upon proof of negligent conduct on the part of each of two persons, acting independently, whose acts unite to cause a single injury. *Essick v. Lexington,* 233 N.C. 600, 65 S.E. 2d 220 (1951); *Evans v. Johnson,* 225 N.C. 238, 34 S.E. 2d 73 (1945). *See also* 65 C.J.S. *Negligence* § 111(2) (1966). Contributing negligence signifies contribution rather than independent or sole proximate cause. *Essick v. Lexington, supra; Noah v. R.R.,* 229 N.C. 176, 47 S.E. 2d 844 (1948).

The following analysis of the doctrine of insulating negligence is determinative with respect to this issue:

"An efficient intervening cause is a new proximate cause which breaks the connection with the original cause and becomes itself solely responsible for the result in question. It must be an independent force, entirely superseding the original action and rendering its effect in the causation remote. It is immaterial how many new elements or forces have been introduced, if the original cause remains active, the liability for its result is not shifted. Thus, where a horse is left unhitched in the street and unattended, and is maliciously frightened by a stranger and runs away: but for the intervening act, he would not have run away and the injury would not have occurred; yet it was the negligence of the driver in the first instance which made the runaway possible. This negligence has not been superseded nor obliterated, and the driver is responsible for the injuries resulting. If, however, the intervening responsible cause be of such a nature that it would be unreasonable to expect a prudent man to anticipate its happening, he will not be responsible for damage resulting solely from the interven-

tion. The intervening cause may be culpable, intentional, or merely negligent."

*Harton v. Telephone Co.,* 141 N.C. 455, 462-63, 54 S.E. 299, 301-02 (1906) (citation omitted).

It is immaterial how many new events or forces have been introduced if the original cause remains operative and in force. In order for the conduct of the intervening agent to break the sequence of events and stay the operative force of the negligence of the original wrongdoer, the intervening conduct must be of such nature and kind that the original wrongdoer had no reasonable ground to anticipate it. . . .

"The test by which the negligent conduct of one is to be insulated as a matter of law by the independent negligent act of another, is reasonable unforeseeability on the part of the original actor of the subsequent intervening act and resultant injury." . . .

In 38 Am. Jur., Negligence, Sec. 67, pp. 722 and 723, the principle is stated this way: "In order to be effective as a cause superseding prior negligence, the new, independent, intervening cause must be one not produced by the wrongful act or omission, but independent of it, and adequate to bring about the injurious result; a cause which interrupts the natural sequence of events, turns aside their cause, prevents the natural and probable result of the original act or omission, and produces a different result, that reasonably might not have been anticipated."

*Riddle v. Artis, supra,* 243 N.C. at 671, 91 S.E. 2d at 896-97 (citations omitted).

It is true that

[a] man's responsibility for his negligence must end somewhere. If the connection between negligence and the injury appears unnatural, unreasonable and improbable in the light of common experience, the negligence, if deemed a cause of the injury at all, is to be considered a remote rather than a proximate cause. It imposes too heavy a responsibility for negligence to hold the tort feasor responsible for what is

unusual and unlikely to happen or for what was only remotely and slightly probable.

*Phelps v. Winston-Salem,* 272 N.C. 24, 30, 157 S.E. 2d 719, 724 (1967). *See also* Restatement (Second) of Torts § 435(2) (1965).

The well-settled rule in this jurisdiction is that except in cases so clear that there can be no two opinions among men of fair minds, the question should be left for the jury to determine whether the intervening act and the resultant injury were such that the author of the original wrong could reasonably have expected them to occur as a result of his own negligent act. *Davis v. Jessup and Carroll v. Jessup,* 257 N.C. 215, 125 S.E. 2d 440 (1962); *Bryant v. Woodlief,* 252 N.C. 488, 114 S.E. 2d 241 (1960); *Harton v. Telephone Co., supra,* 141 N.C. 455, 54 S.E. 299.

We hold that on the facts of this case a jury might readily find that defendant Haygood could have reasonably foreseen the subsequent acts of Alexander and the resultant harm to Hairston that occurred on I-85, barely six minutes and 3.5 miles away from the Haygood dealership. Alexander's negligence in driving was, as the Court of Appeals noted, inexcusable. It was not, however, so highly improbable and extraordinary an occurrence in this series of events as to bear no reasonable connection to the harm threatened by Haygood's original negligence. *Nance v. Parks, supra,* 266 N.C. 206, 146 S.E. 2d 24; *Hall v. Coble Dairies,* 234 N.C. 206, 67 S.E. 2d 63 (1951); *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928). The area of risk created by the negligence of Haygood included the subsequent events and wrongful death of John Hairston.

The trial judge erred in granting Haygood's motion for judgment notwithstanding the verdict.

[3] Defendant Alexander Tank has argued that the trial court's failure to instruct the jury on the doctrine of sudden emergency was prejudicial and reversible error. We have carefully reviewed the relevant facts, and we agree with the Court of Appeals that considering the evidence in the light most favorable to this defendant, Alexander Tank was not entitled to the requested instruction.

The law of the sudden emergency doctrine has been thoroughly stated by this Court. *Crowe v. Crowe,* 259 N.C. 55, 129

S.E. 2d 585 (1963); *Schloss v. Hallman,* 255 N.C. 686, 122 S.E. 2d 513 (1961); *Brunson v. Gainey,* 245 N.C. 152, 95 S.E. 2d 514 (1956); *Hoke v. Greyhound Corp.,* 227 N.C. 412, 42 S.E. 2d 593 (1947). *See Harris v. Guyton,* 54 N.C. App. 434, 283 S.E. 2d 538 (1981), *disc. rev. denied,* 305 N.C. 152 (1982); 9 Strong's N.C. Index 3d *Negligence* § 4 (1977). It serves no useful purpose to restate these principles here.

A motorist is required in the exercise of due care to keep a reasonable and proper lookout in the direction of travel and is held to the duty of seeing what he ought to have seen. *Wall v. Bain,* 222 N.C. 375, 23 S.E. 2d 330 (1942). Where a motorist discovers, or in the exercise of due care should discover, obstruction within the extreme range of his vision and can stop if he acts immediately, but his estimates of his speed, distance, and ability to stop are inaccurate and he finds stopping impossible, he cannot then claim the benefit of the sudden emergency doctrine. 7A Am. Jur. 2d *Automobiles and Highway Traffic* §§ 800-801 (1980). *See Ennis v. Dupree,* 258 N.C. 141, 128 S.E. 2d 231 (1962).

The crucial question in determining the applicability of the sudden emergency doctrine is thus whether Alexander, when approaching the stopped vehicle, saw or by the exercise of due care should have seen that he was approaching a zone of danger. Did his failure to decrease his speed and bring his truck under control without first ascertaining the nature of the highway conditions ahead of him constitute negligence on his part which contributed to the creation of the emergency thereafter confronting him? The sudden emergency must have been brought about by some agency over which he had no control and not by his own negligence or wrongful conduct. *Foy v. Bremson,* 286 N.C. 108, 209 S.E. 2d 439 (1974).

The relevant facts are these: As Mr. Alexander drove north on Interstate 85 that day, he had a clear and unobstructed view downgrade for at least a quarter of a mile to the South Fork River bridge. As Mr. Alexander approached the South Fork River bridge, there was one car in front of him. It was a passenger car moving at about the same speed as he was. It was a standard car, without a rack on top of it, not pulling a trailer, and it was lower than the level of his eye.

The cab of Mr. Alexander's truck was seven feet tall, as tall as the Two-Way Radio van, which was taller than an ordinary passenger car. Mr. Alexander, who was five feet ten inches tall, was sitting in a seat approximately three and a half to four feet off the ground. The seat was chest high to him. When sitting in the vehicle, the top of the cab was about six inches above his head. From this vantage point, he could see over cars ahead of him. In fact, he testified that his practice was to "look over the particular car that is in front of me to see what's ahead." On this occasion, he could see the bridge over the top of the car that was in front of him.

The Two-Way Radio van was red, was six to six and one-half feet wide, and was several feet taller than an ordinary passenger car. Mr. Alexander testified that the van was "a complete red color, almost in a rusty red color." It had a white top and bumper and white lettering across the back. According to Mr. Alexander's testimony, the Two-Way Radio vehicle was about the same height as his own truck. The rear lights of the van were about waist high off the ground. There was at least one rear light burning, emitting a brighter light than a standard tail light. Mr. Alexander thought it was a brake light.

The car in front of Mr. Alexander signalled and moved to its left when it was approximately two hundred feet back from the van. At that time, Mr. Alexander was approximately one hundred feet behind the car in front of him. The evidence, considered in the light most favorable to Mr. Alexander, is susceptible to the inference either that Mr. Alexander did not see the van until the car in front of him moved left, or that he did see it prior to the car moving from in front of him but did not realize that the van was not moving.

Upon realizing that the van was stopped in front of him, Mr. Alexander then applied his brakes, glanced into his left rearview mirror, ascertained that there was nothing behind him for three to four hundred feet, put on his own signal for a left turn, and began a gradual moving out of the right lane into the left lane. He applied his brakes with normal pressure. As he was gradually moving out of the right lane into the left, he collided with the van.

We find that the above evidence, taken in the light most favorable to Mr. Alexander, is not sufficient to yield any inference that Alexander faced a sudden emergency not of his own making or to which his own actions did not contribute. On the contrary, the evidence demonstrates that to the very end Mr. Alexander did not himself perceive any "emergency."

Failing to appreciate that the van was stopped, he compounded his error by misjudging what he then needed to do to avoid hitting the vehicle. The Two-Way Radio van, stopped on the bridge for ninety seconds, was visible for a quarter of a mile and could have been seen by Mr. Alexander within the distance and framework of time had he been keeping a proper lookout.

Any emergency existing on these facts was of defendant's own creation, coming after and because of his negligence. The evidence did not support an instruction on the doctrine of sudden emergency.

[4] In support of its alternative motion for a new trial, defendant Haygood has argued that the trial court committed error in allowing economics expert J. Finley Lee to testify pursuant to certain hypothetical questions.[1]

Dr. Lee's testimony under N.C.G.S. 28A-18-2(b)(4) went to the present monetary value of the decedent to his wife, Mrs. Bettye Hairston, and his daughter, Jonalyn Hairston, for the loss of the reasonably expected net income and services of Mr. Hairston.

On direct examination, the expert was asked the following hypothetical question:

Q. Dr. Lee, if you will listen closely, I'm going to ask you a hypothetical question. If the Jury, sir, should find from the evidence, and by its greater weight, that John O. Hairston was born on April 13, 1931 and at the time of his death was 47 years of age, and had a life expectancy of 27.38 years; that on April 17, 1978 he suffered injuries, as a result of which, he

---

1. Effective 1 October 1981, hypothetical questions are not required in examining expert witnesses. N.C. Gen. Stat. § 8-58.12 (1981). This trial began 1 June 1981. This statute simplifies the presentation of expert witnesses and is designed to eliminate the abuse of the hypothetical question. *See Ingram v. McCuiston*, 261 N.C. 392, 134 S.E. 2d 705 (1964).

died on April 19, 1978; that at the time of his death, he had a work life expectancy of 18 years; that at the time of his death, Mr. Hairston was married to Bettye T. Hairston, who is now 42; that Mr. Hairston had one child, a daughter, who was 17 at the time of his death; that prior to his death, Mr. and Mrs. Hairston lived in Charlotte and his daughter lived in Oakland, California; that Mr. Hairston was an excellent employee; that he worked hard and took pride in his job; that Mr. Hairston enjoyed entertaining, nice cars, and nice clothes; that prior to his injuries on April 17, 1978 Mr. Hairston played Tennis, worked one full-time and one part-time job, and was active in community affairs; that Mr. Hairston graduated from West Charlotte High School and continued his education at Johnson C. Smith University where he graduated with a Bachelor of Arts Degree in Political Science; that beginning in 1956 and until his death in 1978, for a period of 23 years, Mr. Hairston was an employee of the United States Postal Service as a Mail Carrier; that also at the time of his death and for some period prior thereto, Mr. Hairston was employed part-time by Grier's Funeral Home; that Mr. Hairston's gross earnings from his employment at the Post Office were in 1975 — $15,208.00; in 1976 — $16,820; in 1977 — $18,975.46; that Mr. Hairston — strike that last part — based on your expertese [sic] and experience, as an Economist/Statistician and on the facts hypothesized, do you have an opinion, as an Economist Statistician as to the present monetary value of Mr. Hairston to his wife and daughter for the loss of his reasonably expected net income of Mr. Hairston? Do you have an opinion?

Defendants' counsel objected to this question solely on the grounds that it did not include any facts concerning Hairston's personal expenses. When questioned about sources for his calculations of Hairston's personal living expenditures, Dr. Lee testified that (1) he had no personal knowledge about decedent or details of the accident; (2) his information concerning decedent's consumption habits and personal expenses came from decedent's wife, from attorneys for the plaintiff, and from the trial testimony; (3) he had concluded on the basis of this information that the decedent's personal consumption habits "were of a reasonable and average nature"; and (4) he therefore adopted a figure of .3 or 30

percent for this factor in his overall analysis, basing that number on a United States Government consumption study and a study on consumption done in the state of California.

The hypothetical question was reworded to include the phrase "that his consumption habits were reasonable and average in nature." Over the objection of counsel, Dr. Lee was then permitted to offer his calculations into evidence.

Defendant Haygood's objections to the admissibility of this opinion testimony go both to the form of the above hypothetical and to the basis of the opinion elicited thereby.

With respect to the form of the question, Haygood claims that it was error to permit the inclusion of the factual reference to decedent's "reasonable and average" consumption habits, there being no support for such an assumption in the evidence. Other evidence in the case had established, for example, that decedent had purchased a 1977 Cadillac the year before he bought the new Lincoln in 1978 for $14,426.95; at the time of his death, Hairston had a balance of $35.61 in his checking account, $1,000 in personal property, no savings, and no real property.

A hypothetical question may include only such facts as are in evidence or such as the jury will be justified in inferring from the evidence. *Keith v. Gas Co.*, 266 N.C. 119, 146 S.E. 2d 7 (1966); 1 Stansbury's North Carolina Evidence § 137 (Brandis rev. 1973). There is, however, substantial authority to the effect that the interrogator may form his hypothetical question on any theory which can be deduced from the evidence and select as a predicate therefor such facts as the evidence reasonably tends to prove. *Dean v. Coach Co.*, 287 N.C. 515, 215 S.E. 2d 89 (1975); 31 Am. Jur. 2d *Expert and Opinion Evidence* § 56 (1967). In such matters, the trial judge is quite competent to decide whether there is any evidence of the facts assumed to exist in the hypothetical. *Bailey v. Winston*, 157 N.C. 252, 72 S.E. 966 (1911).

Dr. Lee himself testified that the information he gathered was that Mr. Hairston had average consumption habits. Furthermore, the data upon which he based his calculations are broad averages, designed to incorporate extremes of a person "driving a luxury car and one driving a Volkswagon." That the evidence might support contrary facts is not determinative.

We find that the hypothetical questions put to this economics expert were entirely proper. The questions included only those facts in evidence or logically inferred from the evidence and were sufficient to enable the witness to form a satisfactory opinion. Defendant's objection to the form of these questions is without merit.

We find equally untenable the argument that the expert's opinion testimony lacks a proper foundation based as it was on information gleaned from "statistics that have been prepared by other people" and from the plaintiff or her lawyer.

This question has been resolved by this Court contrary to defendant's contentions in *Highway Commission v. Conrad,* 263 N.C. 394, 139 S.E. 2d 553 (1965):

> "The fact that certain elements are not independently admissible in evidence . . . does not bar their consideration by an expert witness in reaching an opinion. Thus, it has been said: 'An integral part of an expert's work is to obtain all possible information, data, detail and material which will aid him in arriving at an opinion. Much of the source material will be in and of itself inadmissible evidence but this fact does not preclude him from using it in arriving at an opinion. All of the factors he has gained are weighed and given the sanction of his experience in his expressing an opinion. It is proper for the expert when called as a witness to detail the facts upon which his conclusion or opinion is based and this is true even though his opinion is based entirely on knowledge gained from inadmissible sources.' "

*Id.* at 399, 139 S.E. 2d at 557 (citation omitted). *See State v. DeGregory,* 285 N.C. 122, 203 S.E. 2d 794 (1974). *Accord Potts v. Howser,* 274 N.C. 49, 161 S.E. 2d 737 (1968).

It is the function of cross-examination to expose any weaknesses in such testimony, which defense counsel undertook to do in fifty-three pages of the transcript.

Defendant's objections to this opinion testimony are without merit.

Appellate courts, absent error of law, are bound by the jury's verdict. Having determined that the trial court erred in entering

the judgment notwithstanding the verdict and that no other errors of law were committed, we hold that the jury verdict in favor of the plaintiff must be reinstated. Accordingly, we reverse the decision of the Court of Appeals and remand this case to that court with instructions to remand it to the Superior Court, Mecklenburg County, for entry of judgment in accordance with the jury verdict in favor of plaintiff.

Reversed and remanded.